**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Thomas Sander, | ) | |
| | ) | **AMENDED** |
| Plaintiff, | ) | **ORDER RE MOTION TO** |
| | ) | **COMPEL DISCOVERY** |
| vs. | ) | |
| | ) | |
| The City of Dickinson, North Dakota, | ) | |
| Kylan Klauzer, Jeremy Moser, Terry | ) | Case No.  1:15-cv-72 |
| Oestreich, and Does 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

In this action, plaintiff sues the City of Dickinson and several of its current or former police detectives for a variety of claims arising out of their having caused him to be arrested and charged with arson of a local Catholic high school of which he was the principal.  Before the court now is plaintiff's motion to compel discovery of information, documents, and tangible items that defendants contend are protected from disclosure by the investigative privilege and also are not relevant.  (Doc. No. 57).  While plaintiff's motion could have been more clear, the court construes it as seeking to compel: (1) the disclosure of those documents withheld from discovery on the grounds of investigative privilege as identified in the City's privilege log; and (2) further deposition testimony from defendants Klauzer and Oestreich with respect to the City's investigation after the date of the dismissal of the charges against plaintiff that was foreclosed by instructions not to answer on grounds of investigatory privilege by defendants' counsel as set forth in the excerpts of the depositions attached to the motion.

## I.   **BACKGROUND**

What follows is some background with respect to the fire, the defendants' investigation

1

leading up to the charging of the plaintiff, the dismissal of the charges without prejudice, and the continuing investigation.  Along the way the court will make observations that are relevant to the factors it is required to consider in evaluating the claim of investigative privilege.  Most will relate to the court's ultimate conclusions: (1) that a combination of events beyond the control of prosecuting authorities, the passage of time, and the City's mishandling of the investigation together make it unlikely that there will be any future criminal prosecution, absent someone now coming forward and confessing; and (2) that plaintiff's case is not frivolous, even if it turns out to be legally insufficient.

Also, it is worth noting that, with respect to the "facts," there is much that cannot be taken as established because of differing accounts given by those with knowledge and, as discussed in more detail later, confessions by two persons (each claiming to have been the arsonist) both of which were later recanted.  Also, at critical points, the only information that is available comes from single sources whose motivations to tell the truth are subject to question.

### A.      The fire

The fire started in the vault of the school's main office during or around the early morning hours of March 3, 2014.  According to an investigation conducted by the Bureau of Alcohol, Tobacco, and Firearms ("ATF") and relevant to what comes later, the fire started just outside three file cabinets located along the rear wall of the vault, but not inside any of the file cabinets given the state of their contents following the fire.  (Doc. No. 65-11, pp. 35-39, 61).  Further, the ATF concluded that school's alarm was triggered by the breaking of the glass and the pulling of the alarm at one of the pull-stations (most likely by the arsonist) and not be one of the smoke detectors.  (Id. at pp. 54-55, 58).  Notably, the school's alarm system, which was ancient, was not connected to the

fire department.

Why would the arsonist set off the alarm, if it was the arsonist?  One reason may be that the arsonist was aware there was a person living in the school and wanted to insure the person was not hurt.  Another might be to insure that the damage was limited to consuming what was set on fire in the vault and not the entire school.  Notably, if it was *only* the latter, that might suggest the arsonist was unaware that the school's fire alarm was not connected fire department, which might lessen the possibility the arsonist was certain suspects, including the plaintiff.

**B.     The accounts of those with the most immediate knowledge**

*1.     Richard Storey's account*

The person who professes to first have knowledge of there being a problem at the school is Richard Storey.  Storey, who was then one of the school's teachers, lived in an apartment in an upper floor of the school building.  He was in the building when the fire started.

Storey was interviewed by police several times following the fire.  The general thrust of what he recounted was as follows.  He was awakened between 12:15 and 12:30 a.m. on March 3, 2014 (which was a Monday morning) by the school's fire alarm going off  but did not see or smell any smoke at that time.  He got dressed, went outside to await emergency personnel, and after five minutes or so when no one arrived, went back inside because he was cold and attempted to call the plaintiff, who, as noted above, was the school's principal.   When plaintiff did not answer, he then called Rich Holgard, with whom plaintiff was living.  Holgard told him he could come over to his residence, which was just across the street from the school, to stay while things sorted themselves out.  According to Storey, his cell phone log showed the calls to plaintiff and Storey were at 12:53 and 12:54 a.m., respectively.   Storey then proceeded to the Holgard residence and, after he arrived

there, he and Holgard decided to awaken plaintiff after they concluded the school's alarm system was not linked to the fire department. (Doc. No. 53-1, pp. 5, 7, 9, 15-16).

Storey further recounted that, after plaintiff was awakened, he and plaintiff proceeded to the school where upon entry they could smell smoke. They then divided up. Plaintiff proceeded to his office to check the alarm panel while he (Storey) went to inspect the cafeteria and the garage. When he (Storey) found nothing and proceeded to the office, he observed plaintiff manipulating the lock on the vault and then opening it. At that point, smoke streamed from the vault but no flames were seen. There ensued some discussion about whether or not to use the fire extinguisher with the decision being not to. Storey then recounted that he exited the school while plaintiff went to his office to call 911. Plaintiff then came out of the building but went back in briefly to retrieve his laptop from his office. (Id.).

Storey recounted he had been out earlier on the evening of March 2 and had returned to the school about 8:30 p.m. He observed plaintiff was working in his office, which he said was a common occurrence and that it was not unusual for plaintiff to work late. Storey claims he went to bed about 9:30 p.m. and remained there until he was awoken by the alarm. (Id.).

Notably, the only evidence of what Storey did or did not do up until he made his phone calls to plaintiff and Holgard comes from him. There is no one to corroborate his account, and, as pointed out by plaintiff's expert in this case, Storey voluntarily submitted to a re-interview in October 2014, which was after criminal charges had been brought and dismissed against plaintiff. There is some information that Storey was deceptive and that, when confronted with that fact, he invoked his right to counsel. (Doc. Nos. 57-7; 97).

Storey and plaintiff both described there relationship as being friends. (Doc. No. 53-1, p.

9; 53-8, p. 25).  However, there is some evidence that plaintiff had told Storey that his performance needed to improve or he might not be renewed for the next year if he did not. (Tr. 53-1, p. 38). Monsignor Schumacher (the Vice-President of the local Catholic school system with responsibility for the high school) later told investigators that Storey was young, inexperienced, and not the most effective teacher. Storey departed of his own volition at the end of the school year.  (Doc. No. 89-1, p. 12).

2. *Plaintiff's initial account at the scene and the note in the laptop*

Plaintiff, who is single, acknowledged when questioned during the early morning hours of March 3 that he was working at the school late the evening prior, stating that he often did so.  He said he left the building at 11:50 p.m., and was fairly certain about the time having minutes before sent an e-mail to staff and observed the time on one of the school's clocks as he was leaving.   He stated he had been in the vault earlier that evening to get office supplies and that, while he thought he had locked it, he could be mistaken.  He indicated that there were a handful of individuals who had the combination for the vault and that it was possible to access the office area where the vault was located even if the office doors were locked.  (Doc. No. 5-6, 7-8).

Plaintiff reported that there was nothing unusual when he left the office.  When asked whether there was anyone else in the school that evening other than Storey, he stated that the Athletic Director, Andrew DesRosier, had been in the office for a short period of time at about 10:30 p.m. to make copies for an upcoming girls basketball tournament.  Plaintiff said this was somewhat unusual for DesRosier and that, while he saw DesRosier leave the office, he could not be sure

5

DesRosier had left the building. (Id.).[1]

Plaintiff stated that, upon leaving the school, he went directly to the nearby Holgard residence where he was staying and went to sleep. Plaintiff's account of being wakened by Holgard, going to the school with Storey, and then discovering the fire more or less matched Storey's account. The officer at the scene who talked to plaintiff concluded in his report that plaintiff appeared to be anxious and somewhat evasive. (Id.). There is other evidence, however, that plaintiff was socially awkward, often uncomfortable in personal settings, and had trouble looking people in the eye. (Doc. Nos. 53-1, p. 15; 81-9, p. 7).

Plaintiff then sat with three others in a vehicle watching the fire department work. Plaintiff stated that, while sitting in the vehicle, he opened the top to his laptop and found a blue-colored sticky note with the words, "I will bring this school to its knees." Plaintiff immediately turned this over to the officer on the scene given that it might be evidence that the fire had been deliberately set. (Doc. No. 53-1, pp. 5-6, 7-8).

### 3. Richard Holgard's account

Holgard was interviewed by the Dickinson police. He stated that Plaintiff arrived home about 11:30 p.m. and went to bed. He stated the call from Storey came at about 12:52. According to Holgard, Storey asked him to notify plaintiff, so plaintiff could come to the school, verify the situation, and reset the alarm. He said there was some discussion about the school for some time having false alarms. Holgard stated he woke Plaintiff up, that Plaintiff got dressed quickly, and that Plaintiff left immediately for the school. (Doc. No. 53-1, pp. 27-28).

---

[1] DesRosier told authorities he was working that evening on several matters, including pulling up some carpets in the gym, preparing for a substitute teacher the next day, and copying material for an upcoming tournament. He stated he left the school at precisely 11:00 p.m. (Doc. No. 53-1, p. 30). He was never considered a suspect.

Notably, while Holgard had plaintiff arriving at his residence prior to plaintiff stating when he left the school, both of their accounts are consistent with plaintiff not being in the school after midnight when Storey first heard the alarm.  This is a problem for any case against the plaintiff, particularly if it is assumed that the alarm went off because it was pulled (which is what the ATF concluded) and that it was pulled by the arsonist.

### C.    The immediate focus upon plaintiff as the arsonist

While there were other persons who potentially could have accessed the office as well as the vault (even if the vault had been locked prior to the fire, which is not a certainty), the City's detectives immediately focused upon plaintiff as being the perpetrator, believing he had both the means (he had been in the school close to the time when the fire started and had access to the vault) and what they believed to be motive.  Defendants quickly learned that plaintiff had earlier been informed that his contract for the next school year was not being renewed.  Further, they learned that the school's administration had  scheduled an upcoming meeting with several students to consider a complaint made by a female student who found offensive the manner in which he had worn a pair of shorts over his trousers during a recent dress up event.  (Doc. No. 53-1).

With respect to the latter point, however, there is no evidence that plaintiff knew there was going to be an upcoming meeting about the incident.  Further, school administration officials kept plaintiff on for the rest of the school year after advising his contract would not be renewed.  Finally, there is evidence that plaintiff, while initially disappointed, had accepted his nonrenewal without any apparent bitterness or ill-will.  (Doc. Nos. 53-1, pp. 5, 14-15; 53-8, p.19; 81-9, p. 8).

**D.      The questioning of plaintiff on March 3 & 4 at the Combined Law Enforcement Center**

Plaintiff was questioned again by the one of the defendant investigators later in the day on March 3, 2014, at the combined Law Enforcement Center.  During this interview, plaintiff stated he had nothing to do with the fire, recounting what he had stated earlier with some additional detail. Plaintiff was not detained at that time.  (Doc. No. 58, video of interview).

Following the March 3 questioning of plaintiff, one of the defendants called Asst. State's Attorney Hope and expressed concern that they may have made a mistake by not advising plaintiff of his Miranda rights during the May 3 station-house interview.  Hope's advice was that plaintiff be advised of his full Miranda rights if he was brought back in questioning the next day.  (Doc. Nos. 53-6, p. 26; 65-7, pp. 6-9).

Plaintiff was called back for questioning the next day.  There is no dispute that Hope's advice of fully advising plaintiff of his Miranda rights was not followed.  Rather, at least one of the defendants made the decision to employ what he euphemistically referred to as a "soft-Miranda" caution, omitting the parts about plaintiff having the right to consult with an attorney and that, if he could not afford one, that an attorney would be appointed.  (Doc. No. 53-3, pp.23-25).[2]  After several hours of interrogation, which employed the use of highly questionable tactics (if not ultimately coercive when used collectively), plaintiff confessed and was held in custody.   In addition to the

---

[2]  Det. Oestreich testified that he and Det. Klauzer specifically agreed that only a partial Miranda warning would be given because of the concern that plaintiff would clam up if he consulted with an attorney and the need to obtain a confession given the paucity of hard evidence against plaintiff.  (Doc. No. 53-3, pp. 22-27).  Det. Klauzer later denied any agreement to give less than a full Miranda warning, claiming "soft-Miranda" to him meant that the full advice would be given but using language that was less stark and that is what he thought had been agreed to and what Det. Oestreich would have given plaintiff before he (Klauzer) entered the room during the middle of the interrogation.  (Doc. No. 53-6, pp. 58-59).  After Det. Klauzer came up with this explanation, Det. Oestreich concluded he was being "thrown under the bus" by Det. Klauzer.  (Doc. No. 53-3, pp. 26-27).

use of only the "soft-<u>Miranda</u>, the tactics of the two officers interrogating him included:

- Repeatedly telling plaintiff that they had the goods on him and all they wanted to know was "why" he started the fire since it was no longer a question of "if," including telling plaintiff they had a "10-point handwriting match" to the note from the laptop, which was false,[3] and that they had video evidence implicating plaintiff, which also was false.[4]  The actual truth was that they was no independent direct evidence - eyewitness, video, or forensic - that plaintiff had started the fire.

- Suggesting to plaintiff he likely would get nothing more than a slap on the wrist if he confessed (most likely probation with a requirement of restitution) but a long jail sentence if he did not.  This included suggestions that they would recommend this lenient treatment and that the prosecutors almost always followed their recommendations.

- Suggesting to plaintiff that, if he came clean, he likely would be allowed to go home for the present, but he was facing immediate incarceration if he did not.

- Refusing to allow plaintiff to leave the interrogation room on more than one occasion as well as twice denying him the use of a bathroom after he requested he be allowed to do so.

- Interrogating plaintiff in what arguably was a physically threatening manner by positioning plaintiff in the corner of the small interview room and then pulling their

---

[3]  Defendants had the note examined by a handwriting expert who concluded he could not eliminate plaintiff as the author but that it was within the realm of reasonable probabilities that it could have been authored by someone else.  Notably, defendants did not submit for examination the handwriting of either J.G. or Storey for comparison. (Doc. No. 53-4).

[4]  There was no video evidence whatsoever.  (Doc. No. 53-3, pp. 31-32).

chairs up close to him.

(Doc. Nos. 58, video of interview; 65-9, transcript of interview).[5]

Plaintiff ultimately confessed to having started the fire and continued to be detained despite the promise of the investigating officers that he would be let go if he did so.  While it may ultimately be held in this case that the level of coercion was not enough to constitute a violation of plaintiff's constitutional rights - a point that is the subject of pending motions for summary judgment, plaintiff's claim of coercion is by no means frivolous.

When plaintiff confessed, the City's investigators were convinced they had their man. However, what appeared to be a "lock solid" case against plaintiff, given the confession, almost immediately began to unravel.

When investigators left the interview room, and before Plaintiff was taken to the jail, Plaintiff made a phone call in which he stated: (1) he had not started the fire but was concerned in light of what investigators were telling him that he could not prove he did not; and (2) that he confessed because he did not want to go jail that day, stating that this was what investigators had told him would happen if he did not confess, and that he did not want to later go to prison, which he understood from what investigators told him would not happen if confessed now.  (Ex. 65-9, pp. 200-206).

Also, there were several inconsistencies between his confession and what may be the actual facts, although the investigators may not have known that immediately.  For one thing, plaintiff

---

[5]  On the other hand, plaintiff was well-educated, possessing two masters degrees.  Further, he does mention during the interview that maybe he should consult with an attorney, although the questioner was quick to move him off of that point.  Plaintiff further acknowledged in his deposition in this case that he understood that he had the right not to answer questions when the interview on March 4 began but that the combination of the lies and the coercive nature of the interview led him to conclude he had no other choice but to talk believing that was the only way he would be allowed to leave that day and, more importantly, avoid a prison sentence.  (Doc. No. 53-8, p. 78-86, 101-03).

10

claimed he started the fire by using a match to light paper that was either inside the file cabinet or that he placed in the file cabinet and then closed the door of the file cabinet.  This was  consistent with his statements that he only wanted to burn up a few things and not everything in the vault as well as his professing that the fire was initially confined to inside the file cabinet when he returned later with Storey.  (Doc. No. 53-1, p. 35; 65-9, pp. 46-47, 49).   As noted earlier, however, ATF concluded the fire could not have started within the file cabinets given the state of their contents after the fire.

Another problem with plaintiff's account was that not once did he say he pulled the alarm.  One would think that this would be one of the first things that plaintiff would have mentioned in an attempt to minimize his actions, consistent with his claim that he intended that the fire would only burn up a few things, much less endanger Storey who he knew was likely in the building.  In fact, one inference from the statements that he did make was that he was unaware when questioned that the alarm had been pulled.  (Ex. 65-9, pp. 47-48).

In addition to these problems is what happened on the night of March 4 and the early morning hours of March 5 during plaintiff's first night in jail before he was formally charged and taken before a judge as discussed next.

E.    **An anonymous person comes forward claiming he started the fire and that plaintiff was innocent and the additional questioning of plaintiff before he was taken to court**

At 1:50 a.m. in the morning of March 5, and while plaintiff was in custody, a person whose identify was not then known called law enforcement dispatch to report that there was a note at the front door of the Law Enforcement Center and someone needed to read it.  The note and an accompanying paper bag with the word "Twenty" on it was immediately retrieved.  According to

a subsequent report, the note read:

> Thomas Sander Is innocent I broke Into Trinity through the back parking lot entrance (broken door). I entered the vault with this combination 4 left to # 80 3 right to #45 2 left to #30 Right to stop I Then lit a Titan Sweatshirt on Fire and left it on a stack of papers. I stole all money in cash boxes (proof is paper bag I left with this note) As I left building I pulled Fire Alarm near Men's Locker room exit. Release Mr. Sander and I will turn myself In. signed Ghost.

(Doc. No. 55-6, p. 2). A review of surveillance video showed that a male approximately 5'7" to 6'3" in height wearing dark shorts, a long sleeve shirt, and mask dropping off the bag at 12:58 a.m. Notably, the note contained information that was not publically known, including the combination of the vault. (Id.).

Undoubtedly, it was because of this that defendants brought plaintiff back in for additional interrogation before he was taken to see the judge on March 5. The immediate focus of the renewed questioning of plaintiff was whether he had acted alone and who he had talked to since his last interview. At that point, since law enforcement was not then aware that the anonymous person was J.G., a juvenile student at the school, it appears from the renewed questioning of plaintiff that the investigating officers were concerned that the "Ghost" may have been Robert Storey. (Doc. No. 53-9, Ex. I).

At the commencement of the questioning of plaintiff on the morning of March 5, the full Miranda warning was given. During that interview, plaintiff at one point stated he had not started the fire and only confessed the day prior because he did not want to go to prison. After being told by the defendant conducting the interview that he was not interested in listening to plaintiff rehash that again, plaintiff made statements consistent with his having started the fire, but it is not out of the realm of possibility that his reasons for doing so were the same as he claimed the day earlier during his phone call when interrogation on that day had been completed. (Doc. No. 53-9, Ex. I).

12

It was after this renewed questioning by law enforcement that plaintiff was brought before the court.[6]

### F.    The determination that the anonymous person was J.G. and his conflicting statements to defendants including that he was the arsonist

In addition to the initial call to the Law Enforcement Center and the leaving of the "Ghost note," the same anonymous person called the Law Enforcement Center two more times according to one police report.  (Doc. No. 55-6, pp. 2-4).  Further investigation on the part of defendants ultimately led to the arrest of J.G. late on the evening of  March 5.  (Id. at 4).

Upon his arrest, J.G. was taken immediately to the Law Enforcement Center for questioning.  (Id.).  During questioning, J.G. admitted he was the person who had left the "Ghost note," initially claiming that he had done so at the behest of some unknown stranger dressed all in black with a hooded sweatshirt and sunglasses.  Then, when the defendant conducting the questioning stated that story was implausible, J.G. claimed he was the arsonist, which he then later recanted upon further questioning.  (Doc. Nos. 56-2, Ex. B; 65-19).  Upon conclusion of the questioning, J.G. was charged at 2:30 a.m. with "hindering law enforcement."  (Doc. Nos. 65-18; 81-20).

Plaintiff claims the real reason why the City's investigators were quick to dismiss J.G. as the perpetrator and charge him only with obstruction was the fact they had already arrested plaintiff and wanted J.G. out-of-the-picture.  In any event, it does appear that the quick discounting of J.G. as the arsonist (or, at that point, even as an accomplice) led City investigators not to followup on certain evidentiary matters that may have assisted in ruling J.G. in or out, including failing to determine whether the bag that J.G. left with the note may have come from the vault or searching for the lighter

---

[6]  The initial charging document was obtained by defendants on March 5, 2014.  (Doc. No. 53-7).  What is not clear from the record here is what information was provided to the court in support of the complaint at that time, if anything, including whether the court was advised that someone else had claimed responsibility for the fire, including the fact that the person had information that was not publically known,  as well as the fact that plaintiff at least twice had stated that  he confessed only to avoid prison and that he claimed not  to have been involved in starting the fire.

that J.G. claimed to have used and discarded.  (Doc. No. 53-3, pp. 51-52, 55).  In fact, it appears no real attempt was made to verify the whereabouts of J.G. on the night the fire started other than accept at face value the statement of his father that he must have been at home because the next day was a school day with no indication that J.G.'s father actually knew whether he was home or not.  In fact, in one side of a phone conversation that J.G.'s father had with his wife from the interview room at the Law Enforcement, a fair inference from the statements he made was that  neither he nor his wife knew whether J.G. was actually home at the time the fire would have started.  (Id. at p. 52; Doc. No. 65-14, pp. 3, 10-11).

There appears to be several reasons why defendants did not believe J.G. was the arsonist in addition to plaintiff having already confessed.  One is that J.G made no mention of the note left in the laptop and claimed he never entered plaintiff's office.  Further, the defendant interviewing J.G. did not believe the alarm pull-station that he claimed during questioning was pulled was the one.  Also, they did not find in the vault the remnants of any burned sweatshirt.

While these were certainly valid concerns, it does not appear that they were by any means conclusive.  J.G. was never asked about the note when he was questioned.  ATF concluded also that the pull-station identified by J.G. in the "Ghost note" was likely the one that was pulled and set off the alarm and the diagram that J.G. prepared during questioning showing the location of the pull-station was not preserved by defendants, as discussed later.  Finally, one of defendants acknowledged the possibility that the sweatshirt could have been totally consumed by the fire given the extent of the fire damage in the vault.  (Doc. Nos. 53-3, pp. 36-52).

Moreover, in addition to J.G. knowing the correct combination to the vault, and the fact that an alarm lever had been pulled, J.G.'s statements about how he started the fire, *i.e.*, igniting a

14

sweatshirt at the rear of the vault just outside the file cabinets, were consistent with: (1) the ATF's determination of the origin of the fire being outside of the file cabinets; and (2) ATF's determination that no accelerant had been used.[7]  Finally, J.G. also had motive, which was that he was upset about how his father had been treated by the school.  His father had worked for the school for approximately 25 years and had been terminated in the recent past.  (Doc. Nos. 65-12; 65-19, pp. 4-5, 18).  He may have also have been upset by a perception that plaintiff (who had went to bat for him in terms of allowing him to participate in an athletic event despite academic performance issues) was also being poorly treated with plaintiff's nonrenewal.

Defendants subpoenaed J.G. for a deposition in this action.  He declined to provide testimony, asserting his rights under the Fifth Amendment.

### G.   The state court's suppression of plaintiff's confession and the later dismissal of the charge

Plaintiff filed a motion in state court to suppress his confession(s), claiming a violation of his Miranda rights.  On July 1, 2014, the state district court agreed and verbally suppressed plaintiff's March 4 confession on the grounds that Miranda had been violated - a point that the State conceded.  The court also suppressed the incriminating statements made by plaintiff on the morning of March 5, despite the fact that a full Miranda had been given before questioning on that morning, based upon the Supreme Court's decision in Missouri v. Siebert, 543 U.S. 600 (2004).  The court asked plaintiff's attorney to prepare a written order setting forth what the court ordered orally.  That

---

[7]   From the point when the interrogation of plaintiff began on March 4 to the time when J.G. left the "Ghost note" containing details not publically known, plaintiff was either being monitored in the interview room or was being held in jail during which, at that point, his calls were monitored. (Doc. No. 53-3, p. 49).  Consequently, it seems unlikely that plaintiff could have directly or indirectly passed on to J.G. the details of how he started the fire, if he did.  It is, in part, because of the problems with both J.G. and plaintiff's statements that defendants have not discounted the possibility that both may have been involved in starting the fire.

order was entered on  July 3, 2014.  (Doc. Nos. 65-8; 82-10, pp. 83-88).[8]

Notably, the State chose not to appeal.  Six days after the court orally suppressed Plaintiff's March 4-5 confessions, the State dismissed the criminal charge against plaintiff without prejudice with the approval of the court.  (Doc. No. 81-23).

Obviously, the reason for the dismissal was because the prosecutors did not believe there was sufficient evidence to get a conviction with the plaintiff's confessions having been tossed.  In fact, the defendant who was overall in charge of the investigation conceded during a deposition taken in this case that, without the confession, City investigators lacked probable cause even for plaintiff's arrest, much less sufficient evidence to prove guilt beyond a reasonable doubt.  (Doc. No. 53-6, p. 53; 60-2, p. 78).  Also, the fact that one or more of  defendants were fearful that they would not get a confession if plaintiff was given a full Miranda warning speaks volumes in terms of the fact that their case was based primarily upon surmise and conjecture without out it.  Finally, the case against the plaintiff absent the confession became even more even more problematic with the "Ghost note" and J.G. making conflicting statements, including that he was the arsonist, on the early morning hours of March 5 before plaintiff was formally charged.

### H.     The defendants' mishandling of evidence

In addition to the foregoing problems for any future criminal prosecution of plaintiff or some other person, defendants failed to preserve what any competent defense attorney will likely claim to be important and material evidence (if not in some instances possibly also exculpatory), including:

- Failing to take steps to insure that all three of the phone calls that J.G. made to the

---

[8]  It appears that plaintiff remained in custody until on or after March 21, 2014, when his conditions of release were modified to include execution of a $500,000 appearance bond with a cash deposit of $50,000, GPS ankle monitoring, and travel limited to the counties of Stark, Burleigh, and Morton.  (Doc. No. 81-22).

Law Enforcement Center were preserved.  It appears one call was not preserved.

• Failing to preserve a document that J.G. reviewed during his recorded interview that, from all appearances, was a witness statement and very well could have been a written statement J.G. prepared pursuant to the common practice of Dickinson police at the time of obtaining written statements prior to interviews.  (Doc. Nos. 53-6, pp. 66; 60-1, pp. 42-44; 60-2, pp. 38-39).

• Failing to preserve a critical drawing made by J.G. during his interview showing the location of the alarm he claimed to have pulled.  (Id.).

• Failing to preserve a drawing that plaintiff made during his March 3, 2014 interview.

• Failing to preserve certain e-mails provided by a citizen witness to one of the detectives that discussed reasons why the one school administration official thought J.G. could be a suspect.  (Doc. No. 60-2, p. 39).

• Turning off the video camera when it got to the point when Monsignor Schumacher expressed concern about J.G. and then not included the substance of those concerns in any written report of the interview.  (Doc. No. 60-1, pp 38-39; 81-9, pp. 4-5, 13-14).

I.    **The continuing investigation**

The City states that its investigation of the Trinity High School fire continues.  The  ATF, however, has closed its file.  (Doc. No. 57-10).  Further, it is apparent from the record here that the City's investigation has stalled.  In fact, to get a future conviction, it likely would take a new confession given: (1) the unlikelihood now (more than three years later) of an eyewitness coming

forward or forensic evidence linking a person to the fire being discovered (no forensic evidence was initially uncovered); (2) the two prior confessions - notwithstanding the recantations and the suppression of plaintiff's confession; and (3) the City's mishandling of the investigation. The prospects of anyone coming forward now and confessing are remote, at best.

## II.   LAW GOVERNING THE INVESTIGATORY PRIVILEGE

The parties in their briefing do not dispute that federal law governing privileges applies notwithstanding the mixture of federal and state claims being made. See, e.g., Heilman v. Waldron, 287 F.R.D. 467, 473 (D. Minn. 2012) (applying federal privilege law in a case of mixed federal and state claims); Lykken v. Brady, No. Civ. 07–4020, 2008 WL 2077937, at **3-4 & n.3 (D.S.D. 2008) (same).   With respect to the investigatory privilege, the court agrees with the following characterization as to the state of the privilege in the Eighth Circuit:

> The investigative privilege is a qualified privilege, and, as the Eighth Circuit has held, the privilege is "a very narrow one." Stephens Produce Co. v. NLRB, 515 F.2d 1373, 1377 (8th Cir. 1975). The privilege "need only be honored where the policy behind its invocation by the agency outweighs any necessity for the information shown by the party seeking it." Id. "The privilege is predicated on the public interest in minimizing the disclosure of documents that would tend to reveal law enforcement investigative techniques or sources." SEC v. Shanahan, No. 4:07CV270 JCH, 2009 WL 1955747, at *1 (E.D. Mo. July 6, 2009).

United States v. D.S. Medical, L.L.C., No. 1:12-cv-00004, 2016 WL 4493679, at *3 (E.D. Mo. Aug. 26, 2016). Also, in determining whether to honor the  privilege, district courts within the Eighth Circuit have applied the same factors that a number of other courts have applied, which are sometimes referred to as the "Frankenhauser factors" after the district court case that first enunciated them.  Those factors are:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4)

> whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; [and] (10) the importance of the information sought to the plaintiff's case.

SEC v. Shanahan, No. 4:07cv270, 2009 WL 1955747, at *2 (E.D. Mo. July 6, 2009) (quoting In re Sealed Case, 856 F.2d 268, 272 (D.C. Cir.1988); see Frankenhauser v. Rizzo, 59 F.R.D. 339 (E.D. Pa.1973).

The burden is upon the party invoking the investigative privilege to establish its applicability. E.g., D.S. Medical, 2016 WL 4493679, at *3. "Importantly, across-the-board claims of law enforcement privilege supported only by conclusory statements will not suffice." Shanahan, 2009 WL 1955747, at *2 (quoting Alexander v. F.B.I., 186 F.R.D. 154, 167 (D.D.C. 1999).

## III.   THE DOCUMENTS WITHHELD BY THE CITY

### A.   Introduction

Following an initial review of the moving papers and the City's privilege log, the court determined it could not rule on the claim of investigatory privilege without at least first inspecting the document that were withheld.  Consequently, the court ordered that they be filed under seal for an *in camera* inspection by the court.  Then, when the court was unable to determine the significance of a number of the documents in light of the City's generalized objections, and given the complexity of the issues, the court, to be fair to the City, ordered an *ex parte in camera* hearing during which only the City's attorney and its Chief of Police appeared.  During that proceeding, the court elicited the additional information required to rule on the claim of investigative privilege as it applied to the withheld documents that were filed under seal at Doc. Nos. 97-107.

### B.      The City's relevancy objections

The City makes two objections based upon lack of relevancy.  The first is its contention that most of the documents are irrelevant to whether plaintiff's confession was coerced.  Second, it argues that any minimal relevancy of the withheld documents is outweighed by the City's interest in maintaining the integrity of its ongoing criminal investigation.  The court will address the first argument here and the second when addressing the claim of investigative privilege.

The are two problems with the City's overarching relevancy objection.  First, plaintiff is suing for more than just that his rights were purportedly violated by his confession having been coerced.  Plaintiff also sues for false arrest and malicious prosecution pursuant to 42 U.S.C. §1983 and under state tort law as well as for defamation.  Further, and even more significantly, it appears the City will be offering at trial evidence of plaintiff's guilt and either explicitly or implicitly suggesting that plaintiff was in fact the arsonist.  This nominally makes relevant most of the City's criminal investigation, regardless of whether it was before or after the dismissal of the charge against the plaintiff.

After review of the documents filed under seal, the court overrules any overarching relevancy objection to their production based simply upon when the documents were created.  However, there are a couple of documents that the court determines all or in part on relevancy grounds need not be turned over.

### C.      Consideration of the __Frankenhauser__ and other factors

#### 1.      *Whether disclosure will discourage citizens from coming forward with information*

During the *ex parte* hearing, the City asserted this factor as a concern.  However, the City was unable to articulate what information citizens who have not yet come forward might reasonably

20

have that would be material to the investigation - other than possibly those who investigators still consider as possibly suspects and those persons are aware they are  still subject to scrutiny.

Based on this and what the court has outlined above, it does appear unlikely now that there are citizens with material knowledge who have not yet come forward.  The City failed to demonstrate this factor to be of substantial concern in this case.

> 2.  *The impact upon persons who have given information of having their identities disclosed*

The court's review of the record indicates that the identities of persons with knowledge are already publically known with most of the them having been disclosed through the dismissed criminal proceeding and others through the discovery in this case.  There is one possible exception, which has to do with the person who provided information in the sealed document at Doc No. 99. The person who gave that information is unlikely to be negatively impacted by any disclosure given the person's position as an attorney.

During the hearing, the City expressed concern about the fact that plaintiff has in the recent past been contacting persons at the school.  However, he already knows who they are and he has the First Amendment right at this point to talk to them.  Further, even putting that aside, the City was unable to point to one instance of any person being contacted who was negatively impacted in some way.

The City has failed to demonstrate that this factor should be accorded substantial weight.

> 3.  *The degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure*

The City has not provided any information or cogent reasoning for why this is a factor that should be considered in this case.

4.      *Whether the information sought is factual data or evaluative summary*

From the court's review of the withheld information, most of it is factual data.  Some of it, however, may also be evaluative.  But, to the extent it is evaluative, it does not appear to reveal more than what is already publically known or can readily be surmised from what already has been turned over during discovery in the criminal case and in this case.  Also, it is too early to conclude at this point that the evaluative information cannot under any circumstances be used either as direct evidence or impeachment with respect to issues of intent and motivation that may be material to plaintiff's malicious prosecution claim.

5.      *Whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question*

This is an unusual case given the criminal charges having been brought against plaintiff and the State's Attorney having to dismiss the charges for lack of enough evidence.  While plaintiff remains a "person-of-interest" with respect to the fire (a point that the City has repeatedly made known outside of what it disclosed to the court *in camera*), it appears clear to this court that the likelihood of the City investigators being able to persuade the State's Attorney to pursue a new charge against plaintiff to be small in light of what has transpired and the fact the situation is unlikely to materially change in the future.  The conclusions that the court reaches in this regard are based on its review of the information that has already been disclosed, as discussed in detail above, as well as the failure on the part of the City to provide any new information *in camera* that would support a different conclusion.

In short, the court cannot conclude that it is "reasonably likely" that the plaintiff will again be charged.  In fact, the probability of anyone being charged now appears to be small.  Hence, while

22

plaintiff remains a person-of-interest, it is not enough in this instance to deny discovery of the withheld information.

### 6.   Whether the police investigation has been completed

The City claims its investigation is still proceeding. However, during the hearing, the City was unable to point to any new meaningful lines of inquiry that remain to be followed and it appears the investigation has stalled. In that sense, it does appear that the investigation is largely complete. Finally, the plaintiff did offer the alternative of a stay of this matter to allow more time for the criminal prosecution to go forward without further simultaneous proceedings in this case. (Doc. Nos. 30). The City opposed that motion. (Doc. No. 34).

### 7.   Whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation

The City stated during the *in camera* hearing that there is not now any ongoing disciplinary proceedings.

### 8.   Whether the plaintiff's suit is non-frivolous and brought in good faith

Whether plaintiff at the end of the day has enough to prevail on any of his claims remains to be seen. He certainly has an uphill task. With respect to the federal claims, it may be difficult for plaintiff to overcome qualified immunity, prove municipal liability, and meet the high burden required for claiming a due process violation. And, with respect to the state law claims, there remains the difficulty of proving malice.

That being said, the court is unable to conclude the suit is frivolous or that it has been brought in bad faith. In addition to the reasons already articulated, this is not a situation where plaintiff filed suit either during the initial phases of the investigation or while the criminal prosecution against him was pending in a transparent attempt to impede or chill either one. Rather,

the suit was filed after the State dismissed its case and only after (1) the City's investigators had obtained a tainted confession from plaintiff using highly questionable, if not outright unlawful tactics - particularly when employed cumulatively, and (2) another person had came forward and admitted not only to starting the fire, but also stating that plaintiff had no involvement, and that person possessed knowledge consistent with his possible involvement that was not publically known and had an equally, if not more, plausible motive.

As for the City's argument that the purpose of the suit is simply to chill any attempt to recharge plaintiff, the City has offered nothing more than speculation that this is the case and, in any event, has placed itself in a poor position to make that argument now given its own conduct and the significant amount of time that has passed without a new charges being brought.  Further, as noted earlier, the plaintiff offered the City an opportunity to stay this matter and the City opposed that motion.

> 9.      *Whether the information sought is available through other discovery or from other sources*

Most of the withheld information likely could not have reasonably been obtained by plaintiff or only with substantial difficulty.  Further, the persons who have provided some of the withheld information should not now have to be burdened by duplicative requests from plaintiff.  The City has failed to demonstrate this is a substantial factor.

> 10.     *The importance of the information sought to the plaintiff's case*

At this point, it is difficult to determine the relative importance of the withheld information to plaintiff's case, but it does appear that  the documents that the court will order be disclosed  may be of some importance if only to defend against the City's defense (explicit or implicit) that plaintiff was in fact the arsonist.

> 11.    *Prejudice to persons with respect to whom a report of suspicious behavior has been made but who are not the subject of any investigation*

While this is a factor not specifically listed in the Frankenhauser list of factors, it is one the court believes it needs to consider. In this case, the provisions for limited disclosure and restrictions upon use of the information without further order from the court adequately address the possible prejudice.

> 12.    *Prejudice to others who also may be subject to investigation but who have not been charged with any crime and may never be charged*

This also is not in the list of Frankenhauser factors but, like the prior one, is something the court should consider.

During the hearing the court expressed concern about the fact that a person other than the plaintiff was determined to have been deceptive with respect to questions about his involvement in the fire in an October 2014 interview, well after the charges against plaintiff has been dismissed. The court had intended to require "attorney eyes only" disclosure of the document (Doc. No. 97) that suggested this. However, the undersigned was shocked to see that the information contained in the document was set forth in plaintiff's expert's report, which as has been publically filed.

It is not clear how plaintiff's expert, and presumably also plaintiff's attorney, obtained the information. It may be that plaintiff's counsel obtained it from the ATF, which, by the way, never claimed investigative privilege in turning over its file information and which the City never attempted to block the disclosure of. However, if plaintiff's attorney obtained the information from the City, then it appears the City's concern about the integrity of its investigation extends only so far and is suspect, at best, particularly with respect to any "bright line" claim that any part of its investigation after the date of the dismissal of the case should be subject to the privilege. Also, if

the City released the information without any attempt to protect its confidentiality, it does not say much for wanting to protect those who still enjoy the presumption of innocence from being negatively impacted.

> **D.   Balancing the relevant factors with respect to the withheld documents**

After weighing all of the above factors with respect to each document in question, the court orders disclosure of most of them, concluding that plaintiff's interests and needs outweigh the interests of the defendants in protecting the "continuing" investigation.  Plaintiff's core claims are not frivolous.  Further, the City has had substantial time to make a case  and the likelihood now of obtaining a conviction appears remote.

That being said, there is one document that the court will order withheld (Doc. No. 100) because it does not reveal evidence that necessarily could be used by plaintiff at this point and  the interests of the City in not revealing its prosecutorial/investigative strategy trump.  Also, there is another document (Doc. No. 101) that does not contain any information that possibly could be useful to plaintiff.

Aside from these two documents, the court will order that the remainder be turned over subject to the confidentiality provisions set forth below.  The confidentiality provisions should mitigate the more legitimate concerns expressed by the City.

## IV.   **THE DEPOSITION OBJECTIONS**

Plaintiff in his motion does not set forth with specificity the questions that were objected to on grounds of investigative privilege, but does attach excerpts from two depositions in which the objections were asserted.  In reviewing those excerpts, it does not appear that plaintiff's attorney posed to the witnesses every question he intended to ask.  Further, there obviously was no

opportunity for followup questions since no answers were given to the few questions that were posed because the witnesses was instructed not to answer. Further, one of the defense counsel made clear that the privilege would be invoked for all questions that sought to elicit information with respect to the investigation after July 7, 2014. In fact, he went so far as to berate plaintiff's counsel during the deposition for not having previously sought a ruling on the claim of investigative privilege for any questions relating to the City's investigation after July 7, 2014. (Doc. No. 57-11, p. 5).

Given these circumstances, the court will not make rulings on any particular questions now. Rather, given the weakness of defendants' position with respect to any claim of investigatory privilege, the court will permit supplemental telephone depositions of defendants Klauzer and Oestreich to address what took place after July 7, 2014, which was the arbitrary date imposed by defendants' counsel with respect to inquiry about matters occurring after that date. The court will then determine what questions must be answered after weighing with respect to each line of questioning, if not each question, the Frankenhauser factors. Further, rather than have to make these rulings after the renewed depositions if claims of investigative privilege persist and there are instructions not to answer, the court may short circuit what otherwise might be a long drawn out process by presiding over the taking of the depositions and making rulings on the spot.

## V.   ORDER

Based on the foregoing, the court hereby **ORDERS AS FOLLOWS**:

1.   Within ten business days of today, the City of Dickinson shall produce the documents filed under seal at Doc. Nos. 97-99 & 102-107 or otherwise allow for their inspection and copying within that time frame. In producing the documents, the City shall indicate for each document the docket number at which the document was

27

filed under seal. The documents shall be treated as being confidential. Plaintiff's attorney shall not disclose the documents or their contents to any persons other than: (1) the plaintiff or plaintiff's attorney's staff, who must also keep the documents and their contents confidential; and (2) plaintiff's experts, so long as they agree in writing to keep the documents and their contents confidential. If plaintiff's attorney needs to use the document for purposes of any court filing, he shall refer to the document by its docket number and not reference its contents, except as otherwise permitted by the court  or unless the court filing is itself under seal.

2.   The City of Dickinson need not produce the document at Doc. No.  100.  The court concludes with respect to this document that the interests of the City in maintaining the confidentiality of the strategy of its investigation in this instance outweighs any interest of the plaintiff, particularly since the document by itself is of no evidentiary value.

3.   The City of Dickinson need not produce the document at Doc. No. 101 because it does not contain information that would be of material use to plaintiff's case.

4.   If plaintiff's case survives the pending motion for summary judgment, the court will allow plaintiff to take a supplemental deposition by telephone of defendants Klauzer and Oestreich to address what took place after July 7, 2014.  The parties are to contact the court before the depositions because the court may wish to participate to rule on any objections in real time.

**IT IS SO ORDERED.**

Dated this 17th day of August, 2017.

28

_/s/ Charles S. Miller, Jr._____
Charles S. Miller, Jr., Magistrate Judge
United States District Court