## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

Thomas Sander,                                     )
                                                   )
               Plaintiff,               )          **ORDER GRANTING DEFENDANTS**
                                                   )          **KYLAN KLAUZER AND JEREMY**
      vs.                                )          **MOSER'S MOTION FOR SUMMARY**
                                                   )          **JUDGMENT**
The City of Dickinson, North Dakota;               )
Kylan Klauzer; Jeremy Moser; Terry                 )          Case No. 1:15-cv-72
Oestreich; and Does 1-10,                          )
                                                   )
             Defendants.                )
_____

      Before the Court is Defendants Kylan Klauzer and Jeremy Moser's "Motion for Summary Judgment" filed on September 9, 2016.  See Docket No. 51.  The Plaintiff filed a response in opposition on September 30, 2016.  See Docket No. 65.  Defendants Klauzer and Moser filed a reply brief on October 14, 2016.  See Docket No. 76.  For the reasons explained below, Defendants Klauzer and Moser's motion for summary judgment is granted.

## I.  BACKGROUND

      This case stems from a fire which occurred at Trinity High School in Dickinson, North Dakota, on March 3, 2014.  The Plaintiff, Thomas Sander, essentially brought this suit against the Defendants because he believes he was wrongfully targeted as a suspect, and subsequently arrested, in connection with the fire.

      On the morning of March 3, 2014, Dickinson police officers were dispatched to reports of a fire at Trinity High School ("Trinity").  See Docket No. 53-1, p. 5.  Dickinson police officers Casey Brosten, Steven Mattson, Hunter Easterling, and Matthew Hanson were the first to arrive on scene.  The officers were informed by dispatch that the fire was contained in the vault area of

the school's main office.  Officer Hanson grabbed a fire extinguisher and ran into the building; he saw smoke filling the hallways and coming from the main office but initially did not see any flames.  The officers waited for the Dickinson Fire Department to arrive, and monitored the building for flames.  When Officer Hanson saw flames begin to come out of the vault and into the office, he used his fire extinguisher to push back the flames, but was unable to go any further into the office due to the extreme smoke.  Eventually, the Dickinson Fire Department arrived and began extinguishing the fire.

At the scene, Officer Hanson spoke with Robert Storey, a teacher at Trinity, who was living in an apartment in the school.  See Docket No. 53-1, p. 5.  Storey said he arrived at the school at 8:30 p.m. and saw the Plaintiff, Thomas Sander, then-principal of Trinity, in his office, noting it was common for Sander to work late.  Storey said he fell asleep and woke to the fire alarm at approximately 12:15-12:20 a.m.  Storey did not smell or see anything unusual and went outside to wait for emergency personnel to arrive.  After waiting approximately five minutes, no one had arrived in response to the alarm, and he attempted to call Sander.  Storey eventually went to Sander's residence which was across the street from the school.  Storey and Sander returned to the school, entered the north gym door, and smelled smoke.  Storey and Sander went towards the office, Sander opened the vault, and smoke poured out.  Storey said he could not see flames, but could hear crackling.  Storey said Sander called 911, and they went outside until emergency personnel arrived.

Officer Hanson also spoke with Sander at the scene.  Sander told him he was "certain" he left the school at 11:50 p.m. the previous night.  See Docket No. 53-1, p. 5.  Sander said he went home and was sleeping when Storey woke him at 12:30 a.m. to tell him about the fire alarm. Sander said they went back to the school, entered the north gym door, smelled smoke, and went

2

towards the main office.  Sander said he went to his office and grabbed his laptop.  Sander said he saw smoke coming from the vault, he opened the door, and smoke "poured" out.  <u>See</u> Docket No. 53-1, p. 6.  Sander said he went back to his office and called 911 from his office phone around "1ish."  Sander said he had previously gone into the vault at 9:30 p.m. to get extra office supplies, and the vault door seemed to open "easy."  When asked to clarify, Sander pulled out a combination to the safe from his pocket and said he did not have to put the entire combination in, the safe had just opened.  When Officer Hanson asked if Sander forgot to lock the safe, Sander said he may have or someone else could have opened it up.  When Officer Hanson asked Sander if he knew of any other information which could possibly help solve how the fire started, Sander said Andrew DesRosier, the athletic director at Trinity, had been in the main office at 10:30 p.m. to make copies which Sander said was very odd and unusual.  Sander noted DesRosier left at 10:40 p.m., but was unsure if he left the building or just the office.  Officer Hanson noted Sander would not maintain eye contact and displayed "signs of deception," appearing "very eager" to give alternative options as to what caused the fire and "very nervous and uneasy with the conversation" when Officer Hanson mentioned the police would be taking the investigation seriously.

After their conversation, Sander got into a pickup with Storey and other Trinity officials who had arrived.  <u>See</u> Docket No. 53-1, p. 6.  After briefing with another officer, Officer Hanson returned to speak with Sander and Storey.  Sander exited the vehicle and told Officer Hanson, "I have not opened this since I got it from my office," and proceeded to open his laptop, revealing a blue sticky note that said "I will bring this school to its knees."  Officer Hanson turned the laptop and note over to Officer Jeremy Moser, the responding investigator.  Officer Hanson asked Officer Casey Brosten to wait with Sander and Storey until they could be transported to the law enforcement center ("LEC") to give their statements.  As Officer Brosten drove Sander and Storey

to the LEC, Officer Brosten noted Sander appeared "very nervous" and "began to sweat profusely from his face," despite the fact that it was very cold outside. See Docket No. 53-1, p. 21.  Sander and Storey were put into separate interview rooms at the LEC and agreed to provide written statements about the incident. See Docket No. 53-1, p. 9.  Neither Sander nor Storey were read the *Miranda* warnings.

Officer Moser first interviewed Storey. See Docket No. 53-1, p. 9.  Storey confirmed he had seen Sander working in his office around 8:30 p.m. when he returned to Trinity that evening. Storey then went to his apartment located in the school, read a book, and went to bed around 9:30 p.m.  Storey confirmed he woke up to the fire alarm and after waiting briefly for the fire department to respond, he called Sander and got no answer.  Storey called Rich Holgard, who Sander lived with, and informed him the fire alarm was going off.  Storey then walked to Holgard's home and spoke with him.  They woke Sander up, and Storey and Sander walked back to the school to check the alarm and smelled smoke when they arrived.  While inside, the two separated, and Storey went to the cafeteria and garage to try and locate the source of the smoke.  Storey returned to the office area and saw Sander open the vault door and smoke "billowed out."  Storey confirmed Sander went to his office and called the police.  When asked if Storey had any suspicions on who would have started the fire, Storey said Sander told him DesRosier was in the officer earlier in the evening, but Storey did not believe DesRosier would have started the fire, and he did not think DesRosier had access to the vault.

Officer Moser next interviewed Sander. See Docket No. 53-1, p. 9.  Sander recounted he worked until 11:50 p.m., drove home to Holgard's house, and was woke up by Holgard at approximately 12:45 a.m. See Docket No. 53-1, pp. 9-10.  Sander said Holgard told him the school's fire alarm was going off. See Docket No. 53-1, p. 10.  Sander said he and Storey walked

4

back to the school, entered the building, and immediately smelled smoke.  Sander explained he went to his office where the alarm panel is located, he checked the main office where there was more smoke, and opened the vault after noticing a lot of smoke coming out of it.  Sander noted only a few people, including himself, have access to the vault.  Sander said he went to his office, called 911, and took his laptop from his office.  Sander thought the fire was potentially caused by faulty wiring because it was an old building and had not been updated.  Sander said that while watching the fire from Holgard's vehicle, he opened his laptop and found the blue sticky note that said "I will bring this school to its knees."  Sander also noted the fire may not have been started by faulty wiring and that somebody "arsoned it on purpose."  Sander speculated the fire may have been set by someone with a grudge against the school, and the person must have been someone that knew Sander.  Sander suggested a "suspect" worth investigating would be Trinity's athletic director, Desrosier, but acknowledged Desrosier did not have the combination for the vault.  When Moser asked Sander what he thought the note meant, Sander said it was probably written by someone who wanted to damage or burn the school or destroy some transcripts or files.  When questioned whether or not the files would have been backed up electronically, Sander said he did not believe the older transcripts or personnel files were electronically stored.

Sander noted that, in February, he had found out his contract was not being renewed at the end of the school year because he was not part of the long-term plan, but that he had hoped to stay on for a few years.  See Docket No. 53-1, p. 11.  Officer Moser asked Sander if his vehicle contained anything in reference to the fire, Sander said no, and said officers were welcome to search his vehicle and bedroom. Moser and Detective Travis Leintz drove Sander to Holgard's residence and Sander allowed them to search his bedroom and his car, neither of which revealed anything of interest.

Later on March 3, 2014, Terry Oestreich, a Dickinson police investigator at the time, met with several school officials, including Monsignor Patrick Schumacher, Steve Glasser, Father Kregg Hochhalter, Richard Holgard, and Andrew DesRosier about the fire.  See Docket No. 53-1, p. 27.  Holgard generally confirmed the timeline of Storey's and Sander's statements.  When Holgard was notified of the fire, he drove to the school, and waited with Sander, Storey, and Glasser.  At some point while Sander was sitting in Holgard's vehicle, Sander opened his laptop, and told the others there was a sticky note and read it aloud.  Holgard noted Sander became anxious and wanted to show the note to the police officers.  DesRosier confirmed he was working at the school the previous night, but had left at approximately 10:30 p.m.  See Docket No. 53-1, p. 28.

The following day, on March 4, 2014, Oestreich contacted Sander inviting him back to the LEC for a second interview. See Docket No. 53-1, p. 31.  The interview began around 11:00 a.m. For approximately the first half hour, Sander and Oestreich discussed personal histories and interests. See Docket No. 58 (Exhibit L)[1].  Oestreich then informed Sander that he was not under arrest, he could go anytime he wanted, and anything he said could be used for the investigation. See Docket No. 58 at 00:27.  The next half hour consisted of Sander explaining his whereabouts and actions on the day of the fire; during that time, Sander spoke with relatively minimal interruptions by Oestreich. See Docket No. 58 at 00:30.  Only into the second hour did Oestreich first indicate that they were considering Sander as a potential suspect. See Docket No. 58 at 1:10.

Oestreich noted a handwriting expert had conducted an analysis and determined there was a ten-point match between the sticky note Sander found on his laptop and Sander's handwriting from his previous written statement.  See Docket No. 58 at 1:13.  Oestreich also stated he was

---

[1] All future citations to Docket No. 58 refer to Exhibit L unless otherwise indicated.

aware Sander had come into a difficult situation at the school, he was being let go at the end of the year, and he had been treated unfairly.  See Docket No. 58 at 1:15.

Approximately an hour and a half into the interview, Sander stated "I need to get an attorney."  See Docket No. 58 at 1:30.  Oestreich confirmed it was Sander's right to do so, but "it never gets any easier."  See Docket Nos. 58 at 1:30; 65-9, p. 26.  Sander continued to speak with Oestreich, however, and did not further express a desire to speak to an attorney.  Eventually, Sander got up to leave, stating "I would like to leave--I'm not under arrest--because we're not getting anywhere."  See Docket Nos. 58 at 1:43; 65-9, p. 29.  Oestreich and Sander kept talking for a short time, and then Sander attempted to walk out of the interrogation room when Officer Kylan Klauzer entered and asked Sander to go back into the room and informed Sander he might not be free to leave.  See Docket No. 58 at 1:55.  Sander was left alone in the interrogation room for a few minutes before Oestreich and Klauzer returned.  See Docket No. 58 at 1:58.

Upon returning, Klauzer stated he had been investigating the fire, and they had evidence that no one had entered the school after Sander left.  See Docket No. 58 at 1:59.  Sander again attempted to leave, but Klauzer informed him he was not free to leave.  See Docket No. 58 at 2:12.  Sander again later asked if he was allowed to leave, and was told "no, not right now."  See Docket No. 58 at 2:27.  Eventually, Sander asked about the consequences of talking.  See Docket No. 58 at 2:41.  Klauzer stated that if Sander was honest, Klauzer's intention was to help Sander obtain a plea deal with ideally no jail time.  See Docket No. 58 at 2:41.

At one point in the interview, Sander asked if he may be allowed to use the restroom while supervised. See Docket No. 58 at 2:43.  The officers did not directly respond to his question.[2]

---

[2] Sander reiterated his request to use the bathroom approximately ten minutes later after he initially asked to do so.  See Docket No. 58 at 2:52.  Klauzer responded saying he wanted to talk about

Although Klauzer stated he could not make any promises, Oestreich repeatedly noted the state's attorneys would "listen" to them.  See Docket No. 58 at 2:45.  Sander asked the officers whether he will be able to consult an attorney afterwards, and both officers stated "absolutely."  Sander then began to confess to starting the fire.  A little over the three hour mark, Klauzer left the room, and Oestreich finished questioning Sander alone.  See Docket No. 58 at 3:10.

Sander was eventually left alone in the interrogation room.  See Docket No. 58 at 3:29. During that time, Sander placed a call on his cell phone, explaining he confessed to setting the fire because the police told him they had so much evidence against him; they were not going to allow him to leave that day if he denied starting the fire; and he was hoping to get a lesser sentence and no jail time.  See Docket No. 58 at 3:40.  Sander was arrested that day and charged with arson and endangerment by fire or explosion.  By 4:40 p.m. on March 4, a press release from the Dickinson Police Department was issued, noting that Sander had been taken into custody and outlining the charges he faced.

After Sander was arrested on March 4, police dispatch received an anonymous call from a male caller who identified himself as "The Holy Ghost" at 1:51 a.m. on March 5, 2014.  See Docket No. 55-6, p. 2.  The caller stated there was a note by the LEC's door that needed to be read.  A note was found in the location where the caller indicated.  The note stated:

> Thomas Sander is Innocent I broke into Trinity through the back parking lot
> entrance (broken door).  I entered the vault with this combination 4 left to # 80 3
> right to #45 2 left to #30 Right to stay I Then lit a Titan Sweatshirt on Fire and left
> it on a stack of papers. I stole all money in cash boxes (proof is paper bag I left with
> this note) As I left building I pulled Fire Alarm near Men's Locker room exit.
> Release Mr. Sander and I will turn myself in. signed Ghost.

---

"this" first.  Approximately half an hour after his initial request, Sander again requested to use the restroom and was allowed to do so.  See Docket No. 58 at 3:25.  In total, there was an approximately 42-minute delay from Sander's first request to use the restroom.

<u>See</u> Docket Nos. 53-11 and 55-6, p. 2.

Police received another anonymous call from the West River Community Center on March 5, 2014; the male caller stated he was the individual who started the fire at Trinity.  <u>See</u> Docket No. 55-6.  Upon investigating the phone calls, police officers identified James Gordon, a Trinity student, as the likely caller.  Gordon was brought to the LEC for questioning, and Oestreich interviewed him.

Initially, Gordon stated he did not write the note left at the LEC, but received it from a stranger.  <u>See</u> Docket No. 53-10.  However, when pressed for more details, Gordon finally admitted that he wrote the note, explaining he did so to help Sander because he was grateful to Sander for helping with his sports eligibility and giving him a job.  After Gordon acknowledged that he had, in fact, written the note, Oestreich began to express his suspicion that Gordon had started the fire.  Eventually, Gordon admitted to starting the fire at Trinity.  At no time in the interview did Gordon ever mention the blue sticky note, and he also denied ever going into Sander's office.  Gordon continued to vacillate throughout the interview, and ultimately recanted his earlier confession, stating he did not start the fire and was simply trying to help Sander because he did not believe Sander had started the fire.  Gordon was subsequently charged with hindering law enforcement.

State criminal charges were eventually brought against Sander for arson in violation of N.D.C.C. § 12.1-21-01 and endangering by fire or explosion in violation of N.D.C.C. § 12.1-21-02.  <u>See</u> <u>State v. Sander</u>, No. 45-2014-CR-00366 (N.D. Dist. Ct. 2014).  During the course of that case, the state district court ruled that portions of Sander's interrogations were inadmissible against Sander at trial.  <u>See</u> Docket No. 37-1.  Subsequently, the district court granted the State's motion to dismiss the charges against Sander without prejudice.

On June 8, 2015, Sander commenced this suit against the Defendants[3] asserting nineteen separate causes of action.  See Docket No. 1.  Sander's complaint asserts several federal civil rights claims under 42 U.S.C. § 1983 against the Defendants, relating to alleged unconstitutional conduct in investigating, interrogating, and arresting Sander.  The complaint also asserts several causes of action against the City of Dickinson relating to its hiring, training, and supervision of the named Defendants, and alleges several other state law causes of action against all the Defendants, ranging from intentional infliction of emotional distress to defamation and deceit.

## II.   LEGAL ANALYSIS

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id.

The Court must inquire whether the evidence presents sufficient disagreement to require the submission of the case to a jury or if it is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact.  Forrest v.

---

[3] Defendant Oestreich, a former Dickinson Police Department official, has since been elected Sheriff of Stark County, North Dakota and has left the Dickinson Police Department.

Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).  The non-moving party may not rely merely on allegations or denials; rather, it must set out specific facts showing a genuine issue for trial.  Id.

Klauzer and Moser moved for summary judgment on all of Sander's claims against them, arguing they are entitled to qualified immunity and state law immunity.  See Docket No. 52. Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation.  Sheets v. Butera, 389 F.3d 772, 776 (8th Cir. 2004).  "Qualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known."  Littrell v. Franklin, 388 F.3d 578, 582 (8th Cir. 2004) (citation omitted).  The Supreme Court has construed qualified immunity protection to shield "all but the plainly incompetent or those who knowingly violate the law."  Id.  For qualified immunity to apply, a two-part inquiry is conducted:

> (1) Whether the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and
>
> (2) Whether the right was clearly established at the time of the deprivation.

Howard v. Kansas City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009).

## A.  SANDER'S FEDERAL LAW CLAIMS UNDER 42 U.S.C. § 1983

In a 42 U.S.C. § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of other agents under a theory such as respondeat superior or supervisor liability.  Whitson v. Stone County Jail, 602 F.3d 920, 928 (8th Cir. 2010).  Further, the doctrine of qualified immunity also requires an individualized analysis as to each officer because a person may be held personally liable for a constitutional violation only if his own conduct

11

violated a clearly established constitutional right.  <u>Manning v. Cotton</u>, 862 F.3d 663, 668 (8th Cir.

2017).  Thus, Klauzer and Moser are only responsible or liable for their own behavior, individually.

1. <u>**PROBABLE CAUSE – SANDER'S 17TH CLAIM FOR RELIEF**</u>

Underlying many of Sander's federal and state law claims is his assertion that he was

detained on March 4, 2014, without probable cause. Klauzer and Moser argue they are entitled to

summary judgment because Sander relies on the assumption that his confession during the March

4th interview was essential to finding probable cause; however, Klauzer and Moser argue there

was sufficient probable cause to arrest Sander <u>prior</u> to his confession.  <u>See</u> Docket No. 52.

A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable

cause, and an officer is entitled to qualified immunity if there is at least "arguable probable cause."

<u>Borgman v. Kedley</u>, 646 F.3d 518, 522-23 (8th Cir. 2011).  An officer has probable cause to make

a warrantless arrest when the totality of the circumstances at the time of the arrest are sufficient to

lead a reasonable person to believe that the defendant has committed or is committing an offense.

<u>Id.</u> at 523.  Arguable probable cause exists even when an officer mistakenly arrests a suspect

believing it is based on probable cause if the mistake is "objectively reasonable."  <u>Id.</u>  An arresting

officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable

cause.  <u>Devenpeck v. Alford</u>, 543 U.S. 146, 593 (2004).  Although the probable cause standard

allows room for reasonable mistakes by a reasonable person, the qualified immunity standard

protects "all but the plainly incompetent or those who knowingly violate the law."  <u>Greenman v.

Jessen</u>, 787 F.3d 882, 888 (8th Cir. 2015).

In North Dakota, a person commits the offense of arson if he starts a fire or causes an

explosion with intent to destroy a building.  N.D.C.C. § 12.1-21-01.  In *State v. Beciraj*, the North

Dakota Supreme Court affirmed the conviction of a co-conspirator for conspiracy to commit arson based on circumstantial evidence establishing her motive and conduct linking her to the crime. 2003 ND 173, ¶¶ 11-12, 671 N.W.2d 250.  The Supreme Court determined there was sufficient evidence to support the jury's guilty verdict because the co-conspirator and her husband had recently taken out homeowners' insurance; the home was unlocked when firefighters arrived although no family members were present; and the co-conspirator had been seen carrying bags of clothing and other household items away from the home on the day of the fire.  See id.

Klauzer and Moser argue that, like in *Beciraj*, there was ample circumstantial evidence that Sander had committed arson when Klauzer detained him on March 4th:  (1) Sander was at the school, in the main office where the vault is located, less than half an hour before Storey heard the fire alarm; (2) Sander stated the vault was closed when he returned to the school to investigate the alarm, narrowing the window for anyone else to have started the fire; (3) Sander produced the sticky note, which strongly indicated the fire was intentional, from his laptop after Officer Hanson told him the police would be taking the investigation seriously; (4) the fire originated in the vault which few people, including Sander, had access to and the combination for, and none of those individuals were seen in the school the night of the fire; and (5) Sander's contract was not being renewed at the end of the year, supporting a potential motive for arson.  See Docket No. 52.

Given all these facts, and the absence of viable alternative suspects with comparable means, motive, and opportunity, Klauzer and Moser argue there was arguable probable cause to arrest Sander when Klauzer detained him during the March 4th interview.  See Docket No. 52.  Sander's response argues that critical details in his confession were "inconsistent with what was later learned about the fire."  See Docket No. 65, p. 13.  However, Sander's argument is misplaced.  As Klauzer and Moser note, other facts that were uncovered later in the investigation which might

diminish probable cause, such as a potential new suspect and inconsistencies in witness statements, do not undermine the analysis because the question regarding probable cause involves what the officers knew <u>at the time</u> on March 4th.  The Court finds there was arguable probable cause to arrest Sander when Klauzer detained him during the interview on March 4, 2014.

2.   <u>**SUBSTANTIVE DUE PROCESS CLAIMS—SANDER'S 1ST AND 3RD CLAIMS FOR RELIEF**</u>

Klauzer and Moser argue they are entitled to summary judgment on Sander's substantive due process claim because they did not violate a fundamental right of Sander's and, even if they did, their conduct was not conscience shocking.

Klauzer and Moser acknowledge Sander did not receive adequate *Miranda* warnings before being subjected to a custodial interrogation.  <u>See</u> Docket No. 52, p. 19.  However, they argue the Eighth Circuit Court of Appeals has made it clear that defendants may not be held liable under Section 1983 for those alleged failures.  The Eighth Circuit has stated "a litigant cannot maintain an action under § 1983 based on a violation of the *Miranda* safeguards."  <u>Hannon v. Sanner</u>, 441 F.3d 635, 636 (8th Cir. 2006).  Because the reading of *Miranda* warnings is a procedural safeguard rather than a right arising out of the Fifth Amendment, the remedy for a *Miranda* violation is the exclusion from evidence of any compelled self-incrimination, not a Section 1983 action.  <u>Id.</u>; <u>Warren v. City of Lincoln, Neb.</u>, 864 F.2d 1436, 1442 (8th Cir. 1989).  Even assuming that Sander's statements were obtained in violation of *Miranda*, Section 1983 does not provide a remedy for a violation of *Miranda*; thus, Sander's exclusive remedy would have been the suppression of his statements, and he already received that remedy in the state district court.  <u>See</u> <u>Hannon</u>, 441 F.3d at 636.

Further, Klauzer and Moser argue Sander's claims under Section 1983 relating to his Fifth Amendment right not to incriminate himself fails because Sander did not proceed to a criminal trial.  See Docket No. 52.  Statements compelled by police interrogations obviously may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the self-incrimination clause occurs.  Winslow v. Smith, 696 F.3d 716, 731 n. 4 (8th Cir. 2012); Chavez v. Martinez, 538 U.S. 760, 767 (2003).  In Winslow, three suspects who pled guilty and one who pled no contest to murder charges could not bring claims under Section 1983 relating to their Fifth Amendment right not to incriminate themselves because those statements were never used at trial.  696 F.3d at 716, n. 4.  Like in *Winslow*, none of Sander's statements were used in a criminal trial.  In fact, Sander's confession was suppressed by the state district court, and the criminal charges against him were ultimately dismissed.  A failure to give *Miranda* warnings, even if police obtain an unwarned confession, cannot alone support Section 1983 liability.

In order to establish a violation of substantive due process rights, a plaintiff must show (1) that one or more of their fundamental constitutional rights were violated, and (2) that the conduct was shocking to the conscience.  See Flowers v. City of Minneapolis, Minn., 478 F.3d 869, 873 (8th Cir. 2007).  Whether conduct shocks the conscience is a question of law.  Folkerts v. City of Waverly, Iowa, 707 F.3d 975, 980 (8th Cir. 2013).  The threshold question is whether the behavior of the governmental officer is so egregious and outrageous that it may fairly be said to shock the contemporary conscience.  Atkins v. Epperly, 588 F.3d 1178, 1183 (8th Cir. 2009).  Conduct intended to injure will generally rise to the conscience-shocking level, but negligent conducts falls beneath the threshold of constitutional due process.  Id.  The Eighth Circuit has held that investigators shock the conscience when they (1) attempt to coerce or threaten the criminal defendant; (2) purposefully ignore evidence of the defendant's innocence; or (3) systematically

15

pressure to implicate the defendant despite contrary evidence.  Folkerts, 707 F.3d at 981.  However, an officer's negligent failure to investigate inconsistencies or other leads is insufficient to establish conscience-shocking misconduct.  Atkins, 588 F.3d at 1184.

"Fundamental to our system of justice is the principle that a person's rights are violated if police coerce an involuntary confession from him, truthful or otherwise, through physical or psychological methods designed to overbear his will."  Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001).  Whether or not a confession is the involuntary product of coercion is judged by the totality of the circumstances—including an examination of both the conduct of the officers and the characteristics of the accused.  Id.  "[E]ven though the police use overreaching tactics such as the use of threats or violence, or the use of direct or indirect promises, such promises or threats will not render the confession involuntary unless it overcomes the defendant's free will and impairs his capacity for self-determination."  Sheets, 389 F.3d at 778.  Courts are to review the totality of the circumstances, considering "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition."  Id. at 779.  However, it goes without saying that "the interrogation of a suspect will involve some pressure."  Id.

It is clear Moser is entitled to summary judgment on Sander's substantive due process claims.  Moser did not participate in the March 4th interview with Klauzer and Oestreich.  Rather, his interaction with Sander occurred on March 3rd, during a non-custodial interview in which Sander was not considered a suspect or detained, even briefly.  In Section 1983 cases, officials are only liable for his or her own misconduct and are not accountable for the misdeeds of other agents; thus, Moser is only responsible or liable for his own behavior.  See Whitson, 602 F.3d at 928.  Therefore, Moser is entitled to summary judgment on Sander's substantive due process claims.

Klauzer did not use violence or threats of violence to extract a confession from Sander on March 4th.  Although Sander noted in his deposition that the thought crossed his mind that Klauzer and Oestreich might resort to physical violence during the March 4th interview, he acknowledged Klauzer did not touch him nor did Klauzer make threatening statements towards Sander during the interview.  See Docket No. 53-8, p. 79.  Sander asserts the "defendants[4] who are each over 200 pounds" had Sander "pinned in the corner" of the interrogation room.  See Docket No. 65, p. 31. The Court acknowledges that Klauzer and Oestreich were seated close to Sander, and Sander was essentially seated in the corner of the room during the interrogation.  However, the interview took place in a standard Dickinson police interview room, and Klauzer and Oestreich's proximity to Sander was not unduly coercive or threatening.

Sander asserts he was prevented from using the restroom during the March 4th interview. Upon a review of the video recording of the interview, there was an approximately 42-minute delay after Sander initially requested to use the restroom.  While the officers did indeed delay Sander's access to the restroom, the delay was not unreasonably lengthy and does not alone shock the conscience.  Other courts have determined that similar delays do not shock the conscience. See Dowell v. Lincoln County, 927 F. Supp. 2d 741, 752 (E.D. Mo. 2013) (thirty-four minute delay in access to the restroom did not shock the conscience).

The statement to an accused that telling the truth "would be better for him" does not constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary.  Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001).  Further, officers may

---

[4] Throughout his response, Sander often references particular individuals collectively as "Defendants."  However, as asserted above, officials are only liable for his or her own misconduct and are not accountable for the misdeeds of other agents.  See Whitson, 602 F.3d at 928.

elicit statements by claiming not to believe the accused's denials.  Id.  Interrogation tactics such as deception and raised voices also do not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.  Id.  While Klauzer informed Sander that he would do his best to encourage the State's Attorney to seek a sentence without a lengthy prison term, Klauzer also noted he could not make any promises.

It goes without saying that the interrogation of a suspect will involve some pressure as the very purpose is to elicit a confession.  Sheets, 389 F.3d at 779.  However, in reviewing the totality of the circumstances, the Court finds that Klauzer's statements and actions during the March 4th interview do not shock the conscience.  Courts are to consider the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.  See id.  The interrogation on March 4th took place in a standard Dickinson police interview room around 11:00 a.m., and Sander arrived voluntarily at Oestreich's request.  The interview only lasted approximately three and a half hours, and the first hour did not consist of probing or accusatorial questioning.  No violence or physical threats were used.  Further, Sander is an extremely well-educated adult; he graduated from college and got his master's in education, and he was in the process of a graduate program in theology at the time of the interview.  See Docket No. 65-9, pp. 4-5.  In reviewing the totality of the circumstances, the Court finds that the tactics employed by Klauzer during the March 4th interview do not rise to the level of malice or sadism resulting in the inhumane abuse of power that literally shocks the conscience.  See id.; Moran v. Clarke, 296 F.3d 638, 647 (8th Cir. 2002).  Therefore, the Court finds Klauzer is entitled to summary judgment on Sander's substantive due process claim against him.

Sander's complaint also alleges Klauzer and Moser recklessly failed to investigate other leads, namely failing to investigate James Gordon as a viable suspect.  Klauzer and Moser argue they are entitled to qualified immunity on this claim because there is no evidence that they failed to follow any lead or otherwise violate a clearly established right of Sander's.  The Eighth Circuit recognized a substantive due process cause of action for reckless investigation in *Wilson v. Lawrence County, Mo.*, 260 F.3d 946 (8th Cir. 2001), where the Circuit identified the liberty interest at stake as the interest in obtaining fair criminal proceedings.  The test for whether state officers' actions violate this protected liberty interest is whether those actions shock the conscience.  Amrine v. Brooks, 522 F.3d 823, 833 (8th Cir. 2008).  Mere negligent failure to investigate does not violate substantive due process, nor do allegations of gross negligence give rise to a constitutional violation.  Id.

Although Gordon confessed to starting the fire at one point during his interview with Oestreich, Klauzer and Moser argue inconsistencies in Gordon's statement excluded him as a suspect.  Specifically, Klauzer and Moser argue Gordon failed to tell Oestreich in his interview about the sticky note on Sander's laptop which officers believed was a crucial piece of evidence in the case; Gordon denied going into Sander's office when he asserted he started the fire; and there was not a fire alarm in the location Gordon identified.  Further, Gordon's story vacillated throughout the interview, until he ultimately stated that he wrote the note and confessed to try and protect Sander.  The Eighth Circuit has noted that even if police officers credit one individual's statement over another, and they are ultimately incorrect in their conclusions, qualified immunity protects officers from such types of "mistaken judgments."  Brockinton v. City of Sherwood, Ark., 503 F.3d 667, 672 (8th Cir. 2007).  Further, Sander has not demonstrated that Klauzer or Moser's

conduct during the investigation into the Trinity fire "shocked the conscience."  Therefore, the Court finds that Klauzer and Moser are entitled to qualified immunity on this claim.

3.  **FAILURE TO PRESERVE EXCULPATORY EVIDENCE—SANDER'S 2ND AND 12TH CLAIM FOR RELIEF**

Klauzer and Moser argue they are entitled to summary judgment on Sander's allegations that they suppressed or failed to disclose exculpatory evidence.  See Docket No. 52, p. 33.

An investigating officer's failure to preserve evidence potentially useful to the accused or his failure to disclose such evidence does not constitute a denial of due process in the absence of bad faith.  White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008).  Consequently, to be viable, Sander's claim must allege bad faith to implicate a clearly established right under *Brady*.  Id.  Even assuming that Klauzer and Moser failed to disclose exculpatory evidence, the Court finds there was no *Brady* violation because Sander was not convicted.  See Livers v. Schenck, 700 F.3d 340, 359 (8th Cir. 2012).  In *Livers*, the Eighth Circuit determined the investigating officers were entitled to qualified immunity on pretrial detainees' Section 1983 claim alleging the officers failed to disclose exculpatory evidence in violation of their due process rights, since a pretrial right to disclosure of such evidence, if it existed at all, was not clearly established.  700 F.3d at 359-60. Moreover, Klauzer and Moser argue that, to the extent Sander seeks to assert a claim for malicious prosecution under Section 1983, such a claim is barred in the Eighth Circuit, and Klauzer and Moser are therefore entitled to summary judgment.  See Kurtz v. City of Shrewsbury, 245 F.3d 753, 758 (8th Cir. 2001).  The Court agrees.

### 4. CONSPIRACY TO VIOLATE CIVIL RIGHTS – SANDER'S 5TH CLAIM FOR RELIEF

Sander's complaint asserts claims of conspiracy to violate his civil rights against Klauzer and Moser.  See Docket No. 1, p. 11.  To prove a 42 U.S.C. § 1983 conspiracy claim, Sander must show:  (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff.  White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008).  Klauzer and Moser argue that if the Court granted Klauzer and Moser qualified immunity on the claims asserted above, it should also grant summary judgment on Sander's civil rights conspiracy claims against them.  The Court agrees.  Further, Klauzer and Moser argue there is no evidence in the record to support a meeting of the minds as to any intention to violate Sander's civil rights.  Even if Sander argues there was some manner of agreement between Oestreich and Klauzer not to give Sander the complete *Miranda* warnings prior to the March 4th interview, Klauzer and Moser argue that claim would fail nonetheless because the underlying claim, failure to give *Miranda* warnings, is not independently actionable under Section 1983.  See Hannon, 441 F.3d at 636.  The Court agrees.

### B. SANDER'S STATE LAW CLAIMS

### 1. FALSE ARREST, FALSE IMPRISONMENT, MALICIOUS PROSECUTION, AND ABUSE OF PROCESS—SANDER'S 6TH, 7TH, AND 9TH CLAIMS FOR RELIEF

Klauzer and Moser argue they are entitled to state-law immunity on Sander's state law claims for false arrest, false imprisonment, malicious prosecution, and abuse of process because

the determination of whether probable cause to arrest exists is a discretionary function, subject to immunity under N.D.C.C. ch. 32-12.1.  See Docket No. 52, pp. 34-35.

Section 32-12.1-03(3)(c) of the North Dakota Century Code sets forth the discretionary function exception to liability of a political subdivision or political subdivision employee.  Section 32-12.1-03, N.D.C.C., states, in pertinent part:  "A political subdivision or a political subdivision employee may not be held liable under this chapter for . . . [t]he decision to perform or the refusal to exercise or perform a discretionary function or duty, whether or not such discretion is abused . . ."  The North Dakota Supreme Court has interpreted this subsection to provide political subdivisions and their employees immunity from liability for allegations of negligence in the exercise of a discretionary function.  Copper v. City of Fargo, 905 F. Supp. 680, 702 (D.N.D. 1994); see Sande v. City of Grand Forks, 269 N.W.2d 93, 98 (N.D. 1978); McLain v. Midway Township, 326 N.W.2d 196, 199 (N.D. 1982).  Therefore, Klauzer and Moser are immune from liability for Sander's state law claims for false arrest and false imprisonment, regardless of whether they were negligent or whether they exercised due care, provided that they can demonstrate that the decision to detain arrest Sander was a discretionary function.

"There is a substantial amount of independent judgment required to make a decision to arrest or to conclude whether probable cause exists."  Copper, 905 F. Supp. at 702; see Richmond v. Haney, 480 N.W.2d 751, 759 (N.D. 1992).  The Court finds that Klauzer and Moser were exercising highly discretionary functions in the investigation and arrest of Sander,[5] and they are entitled to state-law immunity as a matter of law, and therefore summary judgment on these claims.  Further, irrespective of the availability of state-law immunity regarding these claims, the presence

---

[5] It is unclear whether Moser actually participated in the arrest of Sander, as he was not present in the interrogation room during the March 4 interview.

of probable cause, as discussed above, establishes legal authority to arrest and prosecute, making summary judgment appropriate.

With respect to Sander's state law malicious prosecution claim, the Court finds that he has not established a triable issue of fact on every essential element of the claim. In order to maintain an action for malicious prosecution, one must establish, at a minimum, the following elements:

1. Institution of a criminal proceeding by the defendant against the plaintiff;

2. Termination of the proceeding in favor of the accused;

3. Absence of probable cause for the proceeding; and

4. Malice.

Kummer v. City of Fargo, 516 N.W.2d 294, 298 (N.D. 1994); Richmond, 480 N.W.2d at 755. Even assuming that Sander could establish that either Klauzer or Moser had instituted a criminal proceeding against him and that it terminated in his favor, Sander must still establish the absence of probable cause and malice. Id. As the Court has already previously addressed, probable cause was present when prosecution against Sander was initiated. Further, regarding the element of malice, the North Dakota Supreme Court has stated:

> Overzealous police techniques which lead to a successful defense do not, without more, constitute malice or ulterior purpose sufficient to support a tort claim. Absent some evidence that the defendants were driven by some motive other than to bring an offender to justice, there can be no claim of abuse of process or malicious prosecution.

Kummer, 516 N.W.2d at 298. It follows that even if Klauzer and Moser's actions could fairly be said to constitute overzealous police work, Sander's state law claim for malicious prosecution against them must fail because there is no evidence in the record to support a jury finding of an ulterior motive beyond Sander's conclusory allegations.

The Court finds Sander's state law abuse of process claims against Klauzer and Moser fail as a matter of law for similar reasons.  The tort of abuse of process involves an individual who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it was not designed.  Kummer, 516 N.W.2d at 297.  The essential elements of abuse of process include:  (1) an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding.  Id.  The North Dakota Supreme Court has noted that the improper purpose usually "takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself."  Id.  As noted above regarding the malicious process claim, Sander has failed to point to evidence in the record to support a finding of Klauzer and Moser having an ulterior purpose or motive, other than bringing an offender to justice or that they used any legal process to gain a collateral advantage over Sander.  Accordingly, these state law claims against Klauzer and Moser fail as a matter of law, and they are entitled to summary judgment in their favor.

## 2.  GROSS NEGLIGENCE AND WILLFUL MISCONDUCT—SANDER'S 10TH & 13TH CLAIMS FOR RELIEF

Sander's complaint alleges claims of "gross negligence" and "willful misconduct" against Klauzer and Moser.  See Docket No. 1, pp. 15-16, 18-19.  Klauzer and Moser argue discretionary immunity also applies to these claims, noting that the plain language of N.D.C.C. § 32-12.1-03(30 does not contain an exception to immunity for discretionary acts, and decisions to interrogate and arrest suspect are discretionary acts.  The Court has already concluded that a reasonable officer could have believed there was probable cause to arrest Sander for arson, and that doing so was a discretionary act.  If a reasonable officer could have believed that the arrest was lawful, their

actions cannot constitute gross negligence or willful misconduct.  The Court finds that Sander's state law claims for gross negligence and willful misconduct against Klauzer and Moser fail as a matter of law, and summary judgment is appropriate.

### 3.  <u>DECEIT—SANDER'S 14TH CLAIM FOR RELIEF</u>

Sander's complaint alleges a claim of deceit against Klauzer and Moser and outlines various alleged false statements the officers[6] made to Sander.  <u>See</u> Docket No. 1, p. 19.  The statements Sander refers to in his complaint were presumably made during the March 4 interview, which Moser was not present for.

"One who willfully deceives another with intent to induce that person to alter that person's position to that person's injury or risk is liable for any damage which that person thereby suffers." N.D.C.C. § 9-10-03.  Deceit under N.D.C.C. § 9-10-02 applies where there is no contract between the parties.  <u>Erickson v. Brown</u>, 2008 ND 57, ¶ 24, 747 N.W.2d 34.  Deceit is defined as:

1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

2. The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

4. A promise made without any intention of performing.

N.D.C.C. § 9-10-02.

---

[6] Again, Sander's complaint does not distinguish which officer made which alleged false statement. <u>See</u> Docket No. 1, p. 19.

Klauzer and Moser argue there is no evidence in the record to establish that any deception proximately damaged Sander. Klauzer and Moser argue that the causal connection between the alleged deception, namely the misleading and lying about the evidence in the case, and the ultimate harm which Sander alleges, being prosecuted, is lacking because there was probable cause to arrest Sander independent from his confession. The Court agrees with Klauzer and Moser. The Court finds that Sander has failed to establish a causal connection between the alleged deception and the harm he alleged he sustained. See Grandbois and Grandbois, Inc. v. City of Watford City, 2004 ND 162, ¶ 24, 685 N.W.2d 129 (holding police officers' deception regarding misrepresentations on employment applications for bartender positions was insufficient to prove a causal connection between the omission and the bar's subsequent financial losses following undercover officers' multiple drug arrests). Further, Sander failed to identify any authority for holding law enforcement officers liable under that tort for conduct during an official police interrogation.

### 4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS—SANDER'S 8TH CLAIM FOR RELIEF

Klauzer and Moser assert they are entitled to summary judgment on Sander's claim for intentional infliction of emotional distress against them because their conduct was not extreme and outrageous as a matter of law. The elements of a tort action for the intentional infliction of emotional distress are extreme and outrageous conduct that is intentional or reckless and causes severe emotional distress. Kautzman v. McDonald, 2001 ND 20, ¶ 18, 621 N.W.2d 871. Conduct which qualifies as extreme and outrageous is limited to conduct which exceeds "all possible bounds of decency" and which "would arouse resentment against the actor and lead to an exclamation of 'Outrageous' by an average member of the community." Id. The court must

initially decide whether the alleged conduct may reasonably be regarded as "extreme and outrageous." Id.

Sander's complaint argues the Defendants engaged in extreme and outrageous conduct by "bullying, coercing, and intimidating" Sander into making a "false confession" and persisting in prosecuting Sander "when another individual had admitted to starting the fire." See Docket No. 1, p. 13. Again, Sander's complaint refers to the "Defendant Police Officers" collectively, and does not state which particular officer engaged in certain conduct. See Docket No. 1, p. 13-14. However, many of Sander's allegations of extreme and outrageous conduct appear to relate to the March 4th interview. The officers had legitimate law enforcement objectives in interviewing Sander as they were attempting to determine the identity of a possible arsonist of a local high school. The Court finds that an average member of the community would not exclaim "Outrageous!" upon learning of the officers' actions in this case. As discussed above with respect to the constitutionality of the March 4th interview, the interview did not deviate from practices and tactics commonly employed in police interrogations. Further, as discussed above, the officers did not violate Sander's constitutional rights by failing to investigate another potential suspect. The Court finds as a matter of law that the conduct at issue cannot be said to exceed "all possible bounds of decency" or rise to the level of "extreme and outrageous conduct" as required under North Dakota law. Kautzman, 2001 ND 20, ¶ 18. Therefore, summary judgment on Sander's claims of intentional infliction of emotional distress against Klauzer and Moser is appropriate.

### 5. DEFAMATION—SANDER'S 18TH CLAIM FOR RELIEF

Sander brought a claim of defamation against Klauzer and Moser, asserting "Defendant Officers and Detectives made false and unprivileged statements indicating that Tom Sander was

27

guilty of starting the Trinity Fire and that he would be convicted and punished for that crime." See Docket No. 1, p. 24. It is unclear which alleged statements, made by either Klauzer or Moser, Sander believes are actionable. Again, Sander's complaint does not distinguish which specific defendant made such statements, rather he refers to them collectively as "Defendant Police Officers" or "Detectives." See Docket No. 1, p. 24.

To be defamatory, a statement must be false and unprivileged. See N.D.C.C. § 14-02-03; N.D.C.C. § 14-02-04; Mr. G's Turtle Mountain Lodge, Inc. v. Roland Tp., 2002 ND 140, ¶ 33, 651 N.W.2d 625. Klauzer and Moser argue that any statement allegedly made regarding Sander being charged in connection with the Trinity fire could not support liability because it was not false, as Sander was, in fact, charged. The Court agrees.

In support of his argument, Sander's response points to a media release that was issued informing the public that Sander made voluntary statements during the March 4th interview implicating him in the fire. Sander argues this is "false" because Sander "consistently maintained his innocence" until the Defendants "unlawfully detained," "cornered," "bullied," "lied," and "cut-off his denials." See Docket No. 65, p. 46. However, any alleged misconduct which Sander alleges was committed by the officers during the March 4th interview does not change the media release's statements into false statements. The Court finds that Klauzer and Moser are entitled to summary judgment as a matter of law on Sander's defamation claims against them.

28

6. **NORTH DAKOTA CONSTITUTIONAL CLAIM—SANDER'S 11TH CLAIM FOR RELIEF**

Sander asserts a claim for relief under Article 1, Section 1 of the North Dakota State Constitution.  See Docket No. 1, p. 16.  Article 1, Section 1 of the North Dakota Constitution states:

> All individuals are by nature equally free and independent and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property and reputation; pursuing and obtaining safety and happiness; and to keep and bear arms for the defense of their person, family, property, and the state, and for lawful hunting, recreational, and other lawful purposes, which shall not be infringed.

Klauzer and Moser assert they are entitled to summary judgment on this claim because the North Dakota Supreme Court has never inferred a private right of action under the state constitution.  See Docket No. 52, p. 40.  Sander has failed to point to any case law to support his claim for a private right of action under the state constitution, and this Court will not take the extraordinary step of inferring one.  The Court finds Klauzer and Moser are entitled to summary judgment as a matter of law on Sander's claim against them under Article 1, Section 1 of the North Dakota Constitution.


III.   **CONCLUSION**

After carefully reviewing the entire record and for the reasons set forth above, the Court **GRANTS** Defendants' Klauzer and Moser's "Motion for Summary Judgment" (Docket No. 51).

**IT IS SO ORDERED**.

Dated this 5th day of February, 2018.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court

29